JAMES FARMER v. CITY OF ST. PAUL and Others.[1]

June 19, 1896.

Nos. 9914—(195).

**City of St. Paul—Ordinance Making House of the Good Shepherd a Workhouse—Illegality.**

The only workhouses the city of St. Paul is authorized by its charter to establish and maintain for the imprisonment at hard labor therein of persons convicted of offenses subjecting them to imprisonment, under the charter and ordinances of the city, are such as are subject to the management and control of municipal authority, and whose superintendents or managers are public officers or agents. *Held*, accordingly, that an ordinance of the city establishing the House of the Good Shepherd as a workhouse for female prisoners is void, and that all contracts by the city with the corporation owning and controlling such house for the detention and board of prisoners therein are illegal, and the city may be enjoined from entering into such contracts, at the suit of a resident taxpayer.

**Same—Complaint.**

*Held*, further, that the complaint herein does not show the plaintiff entitled to an injunction restraining the city from paying such institution for its past services in boarding and caring for such prisoners, or to an accounting for money paid by the city in the past for similar services.

Appeal by plaintiff from an order of the district court for Ramsey county, Egan, J., denying a motion to set aside an order for judgment on the pleadings in favor of defendant theretofore made, and denying a motion for a new trial. Reversed.

*Butts & Jaques*, for appellant.

*E. J. Darragh* and *Robertson Howard*, for respondent city and J. J. McCardy, Comptroller of said city.

[1] Reported in 67 N. W. 990.

*C. D. & T. D. O'Brien* and *Stevens, O'Brien, Cole & Albrecht*, for respondent House of the Good Shepherd.

START, C. J. This is an action by a taxpayer of the city of St. Paul to enjoin the city from paying the defendant the House of the Good Shepherd the sum of $71.50 for the board of female prisoners committed to such house by the municipal court of the city, pursuant to an ordinance of the city; also, to enjoin the city from allowing or paying any money from its treasury in the future for such purpose; and, further, to compel an accounting between the city and its co-defendant for all money heretofore paid by the former to the latter for the board of female prisoners. The complaint prays for such other and further relief as may be just. When the case was called for trial in the district court, the defendants moved for judgment in their favor on the pleadings. The court granted the motion, and the plaintiff appealed from an order denying his motion for a new trial.

If the allegations of the complaint, as modified by such of the allegations of the answer as the reply admits, would, if proven, entitle the plaintiff to any relief in the premises, it was error on the part of the trial court to grant the motion of the defendants, and direct a judgment in their favor, without a trial; otherwise, not. The material facts which are admitted by the pleadings are substantially these:

The defendant the House of the Good Shepherd is, and has been since January, 1869, a private charitable corporation, duly incorporated under the laws of this state, and is located in the city of St. Paul. Its members are required to be Sisters of the Society of the Good Shepherd, a religious sisterhood of the Roman Catholic faith. "Its general purpose and object is to reform fallen women, and to afford protection to other females whose circumstances in life might endanger their virtue; and its plan of operation to surround the above-mentioned classes of females with virtuous influences, and accustom them to habits of industry and self-respect." This corporation owns, occupies, and exclusively controls a building or home in the city of St. Paul, known as the "House of the Good Shepherd," and has so owned, occupied, and conducted the same since about the year 1869. It has been the custom for many years past for the municipal court of the city of St. Paul to commit female prisoners to

65 M.—12

the House of the Good Shepherd, from time to time, as they were convicted of misdemeanors subjecting them to imprisonment, under the charter and ordinances of the city. Such commitment was pursuant to an ordinance of the city declaring such house to be a workhouse for female prisoners. The city has paid to the House of the Good Shepherd during the past six years, for the board, lodging, and care of such female prisoners, in all $7,200. During the month of April, 1895, it so kept and cared for certain female prisoners of the city, for which it charged $3.25 per week for each prisoner, amounting to $71.50, which amount was allowed by the city, and it was about to pay the same, when this action was commenced. The city of St. Paul has a public workhouse, but it denies that it has facilities for properly caring for female prisoners therein.

There are many other allegations both in the complaint and answer, which are not admitted, but they are all immaterial save two. The complaint alleges that the plaintiff is a taxpayer of the city; also, in effect, that the city threatens to and intends to continue in the future to send its female prisoners to the House of the Good Shepherd, and contract with it for their detention, board, and care, and pay for the same from the public funds of the city. These allegations are put in issue by the answer of the city, but it contains no disclaimer of such intention; on the contrary, it maintains that the ordinance referred to is valid. The answer of the House of the Good Shepherd disclaims any purpose to ask or accept any compensation for the care of such prisoners in the future.

The first and important question presented by the admitted facts is whether the ordinance in question is valid. The city of St. Paul, as a municipal corporation, has only such powers and rights as have been expressly granted to it by the legislature, or which are incident thereto, and necessary to carry those powers into effect.

The authority of the city to enact the ordinance in question is subsection 36, § 3, subc. 4, c. 26, Sp. Laws 1868,[2] which reads thus:

"The common council of said city may provide by ordinance that any one convicted of an offense before the city justice, subjecting such offender to imprisonment under the charter and ordinances of said city, may be kept at hard labor in any workhouse established by said city for that purpose, or in case of a male offender may be kept at hard

[2] See, also, Sp. Laws 1874, c. 1, subc. 4, § 3, subsec. 36.

labor during his term of imprisonment in such workhouse or upon the public streets and improvements of said city, or both; and may also provide by ordinance that any one convicted of an offense before the city justice as aforesaid, and committed upon non-payment of a fine imposed, may be kept at hard labor in any workhouse of said city as aforesaid, or in case of a male offender, may be kept at hard labor either in such workhouse or upon the public streets and improvements, or both, until such persons shall work out the amount of such fine at such rate of compensation as said common council may prescribe, for a time not exceeding the term of such commitment, and the common council shall have full power to establish by ordinance all needful regulations for the security of such prisoners thus employed, and to prevent escape and insure proper discipline, and shall have power to establish a suitable workhouse in said city for the purpose aforesaid, and under such regulations as the said common council may provide."

This authorized the council of the city to provide by ordinance that any person convicted of an offense punishable by imprisonment under the charter or ordinances of the city, or who was committed for the nonpayment of a fine imposed upon his conviction, might be kept at hard labor in any workhouse established by the city for that purpose. It gives the city full power to establish needful regulations for the security and discipline of such prisoners; also to use the county jail. There is no room for controversy as to the meaning of the term "workhouse" as used in this legislative grant of power to the city. The word, in this state, has a well-defined, popular, and legal signification. It is a place or prison where persons convicted of minor offenses and misdemeanors may be confined and kept at labor. All prisons, jails, and workhouses of this state for the imprisonment of persons convicted of public offenses of any grade must be so far public that the superintendents or keepers thereof must be public officers or agents, whom the courts may command to receive into their custody and detain the persons convicted of crime, and sentenced to be confined therein. Such places of imprisonment, and the keepers thereof, must be subject to the control of the proper public authorities. It was such a public workhouse that the city was authorized to establish. Pursuant to such power, the city jail was, by ordinance approved October 7, 1869, declared to be the workhouse of the city of St. Paul. The chief of police was made its superintendent, and a board of managers, consisting of the junior alderman of each ward, was created, and given general supervision over the workhouse and the management thereof, with authority to prescribe the

kind of labor at which the prisoners might be employed, and to make all proper rules for the government of such workhouse. On the same day, the ordinance here in question was approved. Its provisions are as follows:

"Section 1. That the charitable institution known as the 'House of the Good Shepherd,' and located in the city of St. Paul, is hereby established and declared to be a workhouse for female prisoners, under the charter and ordinance of said city.

"Sec. 2. It shall and may be lawful for the city justice of said city to commit to the care and custody of the superintendent of said House of the Good Shepherd any female who has been convicted of any offense before him, subjecting such female offender to imprisonment under the charter and ordinances of said city, and said superintendent shall keep such prisoner at hard labor, suitable to her condition, in the said workhouse, for any time not exceeding thirty days to be designated in such commitment. The said superintendent shall have authority to prevent the escape of such prisoners, and to insure proper discipline in said workhouse, and if necessary to require the assistance of the chief of police, or any police officer, to maintain such discipline, and to prevent the escape of such prisoners.

"Sec. 3. Any prisoner committed to said workhouse in default of payment of any fine or costs, may at any time pay the superintendent the amount of such fine or costs, and shall be allowed at the rate of twenty-five cents per day, including board, for her labor in commutation of her fine and costs; and upon such payment, or upon payment of any balance due after deducting work, that may have been performed by her, or upon the prisoner working out the amount of such fine and costs, or if she shall be otherwise legally entitled to her discharge, the superintendent shall set said prisoner at liberty, and shall notify the city clerk of such discharge.

"Sec. 4. Any prisoner committed to said workhouse may be released at any time, upon the resolution of the common council.

"Sec. 5. The superintendent of said workhouse shall make a monthly report to the common council of the number of prisoners received and discharged, and of the amount of fines and costs paid by prisoners, if any, and shall be paid out of the general fund of said city the same compensation per week for the board of said prisoners as is allowed to the keeper of the city jail: provided, that said city shall not become responsible for maintaining or supporting the said workhouse, except for the board of city prisoners under this ordinance."

Clearly, this ordinance is in excess of the authority conferred upon the city, and is void for that reason. As a legal proposition (the question of propriety of so doing aside), the city council had as much power to establish and declare any church in the city a workhouse for female prisoners, and authorize the city courts to commit any

female convict to the custody of the rector or pastor of the church, and require and authorize him to keep such prisoners at hard labor not exceeding 30 days, and to make monthly reports to the city council, as it had to declare the House of the Good Shepherd, or any other institution not subject to public control, such a workhouse.

A comparison of the ordinance in question with the one establishing the city jail as a workhouse is invited by counsel for the city, and he claims "that the House of the Good Shepherd was made as much a municipal agency for the suppression of crime as the jail was." If by this we are to understand that, after the passage of the ordinances, it was as much a public workhouse as the city jail was, the proposed test will prove fatal to the claim. The city jail, declared by the ordinance to be a workhouse, was a public building, subject to exclusive public control. A superintendent and a board of managers of the workhouse were appointed and created by the ordinance, who were all public officers. In short, a public workhouse was established by the first ordinance. The reverse is true as to the second. The building declared to be a workhouse is the subject of private ownership and private control. No superintendent and board of managers of the supposed workhouse are provided for. The superintendent of the House of the Good Shepherd is not a public officer or agent. Neither the place where the convicts are to be imprisoned nor the managers thereof are in any manner subject to the control of any public authority.

The municipal court has no power by its commitment to command the superintendent to receive and detain prisoners in the House of the Good Shepherd, for it is a private institution, controlled exclusively by a private charitable corporation. As already suggested, the only workhouse the city was authorized to establish was a public workhouse, which should be governed and controlled by municipal authority. The ordinance does not establish such a workhouse. It is void, and all commitments of female prisoners to the House of the Good Shepherd by the city courts are void. It necessarily follows that any contracts on the part of the city, express or implied, for the future detention and support of prisoners in an institution to which such prisoners cannot be legally committed, are also illegal.

But it does not follow from this conclusion that the plaintiff is of right entitled to invoke the aid of a court of equity to enjoin the

payment of the claim of the House of the Good Shepherd for past services in boarding and caring for such prisoners, or to compel an accounting between it and the city for money paid to it in the past. for such services. While it is true that, upon grounds of sound public policy, the doctrine of ultra vires is applied with greater strictness to municipal than to private corporations, and that in this state a taxpayer may enjoin an unauthorized appropriation of public money, yet in cases where the proposed appropriation is only technically illegal, and it would be more inequitable to grant the injunction than to refuse it, it may be refused. The payment of the $71.50, which the plaintiff, as a taxpayer, seeks to enjoin in this case, is not a proposed gratuity to a private party, or to a religious society or school, as claimed by him, but it is honestly due to the House of the Good Shepherd for boarding and caring for prisoners at the request of the city of St. Paul, and at the command of her courts, made pursuant to an ordinance of the city, which has been in force and acquiesced in by citizens and taxpayers for nearly a quarter of a century. Although it is true that, by reason of the invalidity of the ordinance, the city was not authorized to contract for such board and care, yet the contract was made and executed in good faith on one side, before the ordinance was declared invalid by any judicial authority. The city has received full consideration for the proposed payment, and, in equity and good conscience, the claim ought to be paid; and a refusal to enjoin its payment, under such circumstances, by the trial court, was a proper exercise of its discretion.

Whether a taxpayer may, in a proper case, maintain an action in his own name to compel a municipal corporation and parties to whom it has paid public funds fraudulently or on illegal contracts to account as to such funds, and require the amount thereof to be paid to the corporation, is a question which we are not called on to discuss or decide in this case. If such an action can be maintained in any case, the plaintiff has not, by the allegations of his complaint, shown himself entitled to invoke the aid of equity to compel a repayment to the city of the amount heretofore paid by it to its co-defendant for the board and care of its prisoners. Waiving the technical objection that there is no allegation in his complaint that he has requested the city to bring such an action, we are of the opinion that, on the merits, he is not entitled to maintain this action for the purpose of compel-

ling such repayment, for the simple reason that it would be grossly inequitable to permit him to do so. The reasons we have suggested why the payment of the $71.50 ought not to be enjoined apply with greater force to past payments. It cannot be claimed that the parties to whom the payments were made had any knowledge of the invalidity of the ordinance, or of the judgments of the court committing prisoners to their custody; and the taxpayers of the city have stood by for years, without objecting, while they boarded and cared for such prisoners, and accepted their pay for fair services rendered, relying on the ordinance, judgments, and the contract of the city. Neither the plaintiff nor any other taxpayer is entitled to the aid of equity to compel a repayment to the city of the amounts so received.

But a third claim is made by the plaintiff, to the effect that the city threatens and intends to continue in the future the practice of the past as to committing its female prisoners to the custody of the House of the Good Shepherd, and to enter into contracts with it as to the detention, care, and board of such prisoners, and to pay for the same with public money. If the plaintiff establishes this claim on the trial, he will be entitled to an injunction restraining the city from entering into such unauthorized contracts. Sinclair v. Board of Commrs., 23 Minn. 404. As already stated, the pleadings raise an issue as to the intention and purpose of the city as to continuing the use of the House of the Good Shepherd as a workhouse, and making contracts for the support of its prisoners therein. The plaintiff was entitled to have this issue tried, and the court erred in dismissing the action without a trial of this particular issue.

Order reversed, and a new trial granted.